Grafton
No. 80-237

ERNEST AND ANGELA BRAUCH

v.

MADELEINE MARY SHAW

June 26, 1981

564

*K. William Clauson*, of Hanover, by brief and orally, for the plaintiffs.

*Stein & Viles*, of Concord (*Bruce E. Viles* on the brief and orally), for the defendant.

BOIS, J. This case arises from a petition filed by Ernest and Angela Brauch seeking custody of a child, Rupert Brauch, born out of wedlock to the plaintiff Ernest Brauch and the defendant Madeleine Mary Shaw. The issues presented by the defendant's appeal are whether the petition meets the requirements of RSA ch. 458-A (Supp. 1979), the Uniform Child Custody Jurisdiction Act, necessary to confer jurisdiction on a New Hampshire court, and, if so, whether the superior court may exercise this jurisdiction under the circumstances of this case. A third issue, whether a superior court has jurisdiction to determine which natural parent shall have custody of their illegitimate child, also presents itself on appeal. We hold that the superior court has jurisdiction to make a

custody award to either natural parent and that it could exercise the jurisdiction if it finds in its discretion that it would be in the best interests of the child to do so.

Ernest Brauch and Madeleine Shaw are the natural parents of a child, Rupert, born September 26, 1969, in England. At the time of Rupert's birth, Mr. Brauch and Mrs. Shaw were not married, and they have never been married to each other. Mr. Brauch has acknowledged Rupert as his son since birth, and Rupert's birth certificate bears Brauch as the surname. Mr. Brauch, however, has never formally legitimized Rupert. Mrs. Shaw admits that Mr. Brauch is the father of Rupert.

Mr. Brauch, a naturalized American citizen, is now married to Angela Brauch and is a resident of Hanover, New Hampshire, having moved there in the spring of 1979. Mrs. Shaw, an English citizen, is now married to Dr. Jeremy Shaw and is a resident of London, England. Rupert lived with Madeleine Shaw in London until December 1978, during which time Ernest Brauch supported the child to some extent and extensively and periodically visited Rupert.

In December 1978, Mrs. Shaw sent Rupert to New York to visit with the Brauchs for the holiday season. Two days before Rupert was scheduled to return to England, Mr. Brauch telephoned Mrs. Shaw to express concern for Rupert's happiness and to tell her that Rupert wanted to extend his visit. The next day, after talking with Rupert, Mrs. Shaw agreed to an extension of Rupert's visit. Madeleine Shaw now asserts that she acquiesced only under the protest that "she had no other choice."

In early February 1979, the Brauchs, with Rupert, moved to Rio de Janeiro, Brazil. They returned to the United States in May, and in June finally settled in Hanover, New Hampshire, where Rupert has since lived and attended school. The Brauchs and Rupert continued to communicate with Mrs. Shaw throughout this period, and Ernest Brauch twice offered Mrs. Shaw the opportunity to visit with Rupert in Brazil and in the United States at his expense. Mrs. Shaw declined both offers.

Madeleine Shaw now asserts that she continued to object to Rupert remaining with the Brauchs and to ask for his return. In addition, although admitting that she received telephone calls and an offer to visit during this period, Mrs. Shaw contends that from mid-April to mid-July of 1979 she was unable to locate Rupert and the Brauchs until she read in a London newpaper that Mr. Brauch had been arrested in New Hampshire under an extradition warrant. Mrs. Shaw, however, did not commence legal proceedings to obtain custody of Rupert until February 1980.

On March 13, 1980, the High Court of Justice, Family Division, London, upon petition by Madeleine Shaw, issued an ex parte wardship order, making Rupert a ward of the Court as the first step in awarding custody. The order was personally served on Ernest Brauch on March 21, but, for procedural reasons, the order lapsed on April 3. According to Mr. Brauch, the first time he learned that Mrs. Shaw objected to Rupert staying with him was when the order was served on him. He asserts that, previously, Rupert's stay was by mutual agreement between Mrs. Shaw and himself, and was based on Rupert's strong desires to remain with him.

When the order was served on him, Mr. Brauch retained solicitors in England who filed an appearance for him. Mr. Brauch also filed a petition for custody determination in Grafton County Superior Court on April 10, 1980. On the same day, the English Court issued a second wardship order that was served on Mr. Brauch on April 14. On April 30, *Johnson*, J., held a hearing on the Brauchs' petition for custody. At the hearing, the court first considered Madeleine Shaw's motion to dismiss for lack of jurisdiction and as an inconvenient forum. After hearing testimony concerning the court's jurisdiction, the court proceeded with a hearing on temporary custody orders. Counsel for Mrs. Shaw, however, declined to participate in the temporary custody hearing.

On May 1, *Johnson*, J., denied Mrs. Shaw's motion to dismiss, concluding that the court had jurisdiction under RSA 458-A:3 (Supp. 1979). The court based its decision on the grounds that New Hampshire is Rupert's "home state" and that it is in Rupert's best interests that the court assume jurisdiction because Rupert and his father have a significant connection with this State and because substantial evidence concerning Rupert's present and future interests exists within this State. The court then granted temporary custody of Rupert to Ernest and Angela Brauch and appointed a guardian ad litem.

That same day, Madeleine Shaw filed a motion for reconsideration on the basis that Mr. Brauch was being extradited to England to face charges of fraud on commodity brokers and of currency violations. Since July 1979, Mr. Brauch had been incarcerated in Grafton County Jail pending a decision on his extradition. He finally waived extradition and was returned to England on May 8, 1980. The court denied the motion on May 7.

In England, on May 8, the High Court of Justice stayed its proceedings on the matter of Rupert's custody pending a "determination of the American proceeding for custody or on the return of the

said minor to within the jurisdiction of this Court. . . ." *See* RSA 458-A:6 (Supp. 1979) ("Simultaneous Proceedings in Other States").

Madeleine Shaw next filed a motion with the superior court to decline jurisdiction due to inconvenient forum because Ernest Brauch was incarcerated in England awaiting trial. In a decree dated July 14, 1980, *Johnson*, J., denied the motion and further stated that:

> "[T]his Court finds that New Hampshire does have jurisdiction over the custody of Rupert provided that one of the two potential custodial parents actually resides in New Hampshire as of August 31, 1980. If both of the potential custodial parents are residing in England on said date, whether they be there voluntarily or not, the Court finds that the best interests of Rupert would be served by having the matter of custody determined by the English courts. Counsel for both of the parties are ordered to keep the Court informed as to the status of Mr. Brauch as August 31st approaches and appropriate motions shall be filed depending upon this status."

The last action before the parties filed briefs for the appeal in this court occurred at a hearing on September 9, 1980, before *Johnson*, J., on another motion by Madeleine Shaw to decline jurisdiction due to inconvenient forum. At that hearing, Mr. Brauch's English attorney, John Blackburn Gettings, testified concerning the criminal proceedings pending against Mr. Brauch in England. Gettings stated that, in his opinion, Mr. Brauch would be freed by the English authorities by mid-October 1980, and that, because of an English deportation order, Mr. Brauch would be prevented from contesting any civil issues in England. Mrs. Shaw's motion was denied on September 10. *See* RSA 458-A:4 (Supp. 1979) ("Notice and Opportunity to Be Heard").

The defendant appeals the denial of her motion to dismiss for lack of jurisdiction based on the plaintiffs' failure to meet the necessary jurisdictional requirements of RSA 458-A:3 (Supp. 1979) and appeals the denials of her motions to decline jurisdiction as an inconvenient forum under RSA 458-A:7 (Supp. 1979). Before we can address those issues, however, we must decide whether the superior court has the jurisdiction to determine custody of an illegitimate child between the natural parents.

▬ The superior court does not have "jurisdiction to appoint a custodian of minors . . . since the right of custody is a legal incident of guardianship, and the appointment of guardians is a mat-

ter within the exclusive jurisdiction of the probate court." *Leclerc v. Leclerc,* 85 N.H. 121, 123, 155 A. 249, 251 (1931). When the case, however, does not involve the appointment of a guardian, but relates to a disagreement between parents concerning the exercise of existing joint rights of custody, "the [superior] court might regulate their joint rights by awarding custody to either parent permanently or temporarily . . . ." *White v. White,* 77 N.H. 26, 29, 86 A. 353, 355 (1913); *see Gage v. Gage,* 66 N.H. 282, 286, 29 A. 543, 545 (1890). Accordingly, if both the natural father and the natural mother of a child have existing joint custody rights, then the superior court has authority to enforce and regulate those rights.

█ In New Hampshire, the common law has been that "the mother of an illegitimate child has a right to the custody and control of the child . . . [and] [t]he putative father has no right to the custody and control of the child. . . ." *Hudson v. Hills,* 8 N.H. 417, 418 (1836); *see State v. Byron,* 79 N.H. 39, 40, 104 A. 401, 402 (1918). The question, therefore, is whether the common law can continue to be the prevailing standard for determining custody of illegitimate children.

██ In cases involving a custody determination between married parents, "[t]he paramount and controlling consideration is the overall welfare of the children involved." *Del Pozzo v. Del Pozzo,* 113 N.H. 436, 436, 309 A.2d 151, 152 (1973); *Lemay v. Lemay,* 109 N.H. 217, 218, 247 A.2d 189, 190 (1968). *See generally* Jones & Huff, *Child Custody Redetermination in New Hampshire,* 17 N.H.B.J. 238, 239–43 (1976). The parents have equal rights to custody. *White v. White,* 77 N.H. at 29–30, 86 A. at 355; RSA 463:4. Recently a number of jurisdictions have held that, because the "best interests" of the child is the primary consideration of a custody determination, the natural father of an illegitimate child has custodial rights similar to those of a father of a legitimate child upon a dissolution of marriage. *See, e.g., Orezza v. Ramirez,* 19 Ariz. App. 405, 410, 507 P.2d 1017, 1022 (1973); *Brown v. Bray,* 300 So. 2d 668, 670 (Fla. 1974); *People ex rel. Irby v. Dubois,* 41 Ill. App. 3d 609, 614–15, 354 N.E.2d 562, 567 (1976); *Marshall v. Stefanides,* 17 Md. App. 364, 376, 302 A.2d 682, 688 (1973); *Boatwright v. Otero,* 398 N.Y.S.2d 391, 394 (Fam. Ct. 1977); *Sparks v. Phelps,* 540 P.2d 397, 398 (Or. Ct. App. 1975); *Slawek v. Stroh,* 62 Wis. 2d 295, 304, 215 N.W.2d 9, 15 (1974). Courts in these jurisdictions discern no difference between cases dealing with a legitimate child and cases dealing with an illegitimate child that would cause their main concern to be other than the best interests of the child. *Pruitt*

*v. Jones*, 62 Ohio St. 2d 237, 238, 405 N.E.2d 276, 276–77 (1980); *Com. ex rel. Scott v. Martin*, 381 A.2d 173, 174 (Pa. Super. Ct. 1977) (Price, J., in support of per curiam order). Accordingly, they hold that natural fathers and mothers of illegitimate children have equal rights to custody.

The United States Supreme Court has agreed, holding in an adoption case that undifferentiated distinction between unwed mothers and unwed fathers is unconstitutionally discriminatory against unwed fathers, particularly in cases where their identity is known and they have manifested a significant parental interest in the child. *Caban v. Mohammed*, 441 U.S. 380, 394 (1979). *See also Stanley v. Illinois*, 405 U.S. 645, 658 (1972).

■■ Accordingly, we conclude that the broad common law rule that a natural father has no custodial rights against the natural mother is no longer valid. When the natural father of an illegitimate child has acknowledged and assumed parental responsibilities as in this case, he has custody rights equal to those of the natural mother. The proper standard to be used in a custody proceeding is the "present and future welfare of the child" standard regardless of the child's legitimacy status at birth.

■ The plaintiff father in this case has performed his parental duties. Mr. Brauch has openly acknowledged Rupert as his son since birth. He has maintained a close relationship with Rupert through frequent and extensive visitations. Mr. Brauch has continually provided some support for Rupert and, since December 1978, has assumed sole responsibility for Rupert's care. Under these circumstances, the plaintiff has "manifested a significant paternal interest in the child" and, therefore, has developed a right to custody equal to that of the natural mother.

■ While the legislature has not granted the courts statutory authority to control custody rights of unwed fathers, *Locke v. Ladd*, 119 N.H. 136, 140, 399 A.2d 962, 964–65 (1979), the protection of a constitutional right "is not dependent upon legislative enactment or grant of authority to the judiciary. The authority of the judiciary to provide a remedy guaranteed by the constitution (N.H. CONST., pt. 1, art. 2) stems from the constitution itself and is inherent in the very nature of the judicial function." *Id.* at 141, 399 A.2d at 965; *see In re Irene W.*, 121 N.H. 123, 126, 427 A.2d 24, 26 (1981); *State v. Robert H.* _____ , 118 N.H. 713, 715–16, 393 A.2d 1387, 1388–89 (1978). We hold, therefore, that the superior court, being a court of general jurisdiction, has the authority to deter-

mine custody of an illegitimate child between his natural parents consistent with the "present and prospective welfare" of the child.

We next consider the issues the defendant presents on appeal: whether the superior court has jurisdiction under RSA ch. 458-A (Supp. 1979) and, if so, whether it should exercise that jurisdiction in this case. In determining whether the superior court has jurisdiction, reference must be made to the jurisdictional requirements of the Uniform Child Custody Jurisdiction Act. RSA ch. 458-A (Supp. 1979). The primary purpose of the Act is to promote the stable, secure home environment necessary for the well-being of a child by discouraging both unilateral removal of a child from his present home ("childnapping"), RSA 458-A:1 I(e) (Supp. 1979); *see Sheehy v. Sheehy*, 88 N.H. 223, 225, 186 A. 1, 3 (1936), and relitigation that shifts a child from jurisdiction to jurisdiction. RSA 458-A:1 I(a), (d), (f) (Supp. 1979); *see Fernandez v. Rodriguez*, 411 N.Y.S.2d 134, 137 (App. Div. 1978). The Act also ensures that the best interests of the child are served by having only the jurisdiction which can best decide the custody dispute in the interest of the child make the custody determination. RSA 458-A:1 I(b), (c); *see Cartelli v. Martin*, 121 N.H. 296, 298, 428 A.2d 1243, 1245 (1981).

The Uniform Child Custody Jurisdiction Act is based on the notion that usually the best interests of a child are served by having a custody determination in the jurisdiction where the child has an established home or where the facts concerning the custody of the child are most readily available to the court. *See* RSA 458-A:1 I(c) (Supp. 1979); *Commissioners' Prefatory Note, Uniform Child Custody Jurisdiction Act*, 9 U.L.A. 114 (1979); Bodenheimer, *The Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws*, 22 VAND. L. REV. 1207, 1218 (1969) [hereinafter Bodenheimer]. To this end, the Act sets forth a definite and certain test based on the reasonable assumption that a child is integrated into an American community after living there for six months. *Commissioners' Note*, 9 U.L.A. at 123; *see Mayer v. Mayer*, 91 Wis. 2d 342, 354–55, 283 N.W.2d 591, 598 (1979). Accordingly, the Act provides that a state court has jurisdiction to determine the custody of a child who has been residing in that state for more than six months. RSA 458-A:3 I(a) (Supp. 1979).

It is apparent from the record in this case that New Hampshire courts may elect to exercise jurisdiction in this case. New Hampshire is the child's "home state" because he has lived

here for more than the six statutory consecutive months immediately prior to the commencement of the custody proceeding. The superior court, therefore, was correct in ruling that it has jurisdiction to make a child custody determination.

██ ██ While the defendant admits that she knew for more than six months that her son was residing in New Hampshire, she asserts that the Act deprives the superior court of jurisdiction because the child's presence in this State is due to the father's having improperly retained him. The improper retention of a child does not, in and of itself, deprive a court of jurisdiction; rather, the existence or nonexistence of this circumstance affects only the court's decision to exercise jurisdiction. RSA 458-A:8 I (Supp. 1979); *Appl. of Nelson v. Dist. Ct.*, 186 Colo. 381, 386, 527 P.2d 811, 814 (1974). Once jurisdiction is established, the paramount consideration in determining whether to exercise the jurisdiction is the present and future welfare of the child. *Id.* at 386, 577 P.2d at 814; *see In re Marriage of Settle*, 276 Or. 759, 771–72, 556 P.2d 962, 968 (1976).

The most significant facts in this case are that the child had been in the custody of the plaintiffs for sixteen months and had been residing in New Hampshire for the nine months preceding the commencement of the custody preceedings. Regardless of whether the child's presence in New Hampshire for so many months is the result of the father's having improperly retained the child, the mother's having waited to act to regain the child, or the parties' having mutually agreed to the situation, the "paramount consideration" is still the potential disruption in removing the child from his present environment in order to comply with what may prove to be a tentative foreign decree if the English court ultimately awards custody to the plaintiffs. "It does not require an expert in the behavioral sciences to know that a child, especially during his early years and the years of growth, needs security and stability of environment and a continuity of affection." *Commissioners' Prefatory Note*, 9 U.L.A. at 112; *see* Bodenheimer, 22 VAND. L. REV. at 1208; GOLDSTEIN, FREUD &.SOLNIT, BEYOND THE BEST INTERESTS OF THE CHILD 31–32 (1973).

██ If the court had declined to exercise jurisdiction, the child would have been returned to the custody of the defendant in England. We do not judge the actions of either party because the paramount issue before the superior court and this court is the welfare of the child rather than the tactics of his parents. *See Bosse v. Superior Court*, 152 Cal. Rptr. 665, 668 (Cal. App. 1979);

*Green v. Green,* 87 Mich. App. 706, 714, 276 N.W.2d 472, 475–76 (1978).

■■■ The defendant also asserts that the outstanding English wardship order and pending English custody proceeding deprive the superior court of jurisdiction under the Uniform Child Custody Jurisdiction Act. The Act's policy on comity is that, when there is no outstanding custody award, New Hampshire courts will resolve a possible jurisdictional conflict with a court of a foreign country by deferring to the foreign court if the foreign court was first to assume jurisdiction. RSA 458-A:6, :22 (Supp. 1979); *see Commissioners' Note,* 9 U.L.A. at 167–68. This principle that the court first acquiring jurisdiction should exclusively exercise it may, in this case, be at direct odds with the principle that jurisdiction should be based on the location of the child's "home state." When the rationale of the former principle is considered, however, there exists no conflict. Deference to a prior pending proceeding is designed to prevent forum shopping that results "in the shifting of children from state to state with harmful effects on their well-being. . . ." RSA 458-A:1 I(a) (Supp. 1979); *see Commissioners' Note,* 9 U.L.A. at 134–35. Here, adherence to that principle would contravene its underlying rationale. The child would have been shifted from New Hampshire to England and would have experienced the harmful effects of a disrupted home environment if the superior court had not exercised jurisdiction. Accordingly, the superior court was correct in exercising jurisdiction, regardless of whether the English custody proceeding was commenced before the New Hampshire proceeding.

Finally, the defendant asserts that the superior court does not have jurisdiction because there is greater access to information concerning the welfare of the child in England than in New Hampshire and that, consequently, the superior court must decline to exercise jurisdiction in favor of the more appropriate English forum.

Whenever a child has resided in more than one jurisdiction, all relevant evidence concerning the child's welfare may not exist exclusively in one jurisdiction. Naturally, information concerning the first nine years of the child's life is more readily available in England and is pertinent in determining custody. The child, however, had not resided in England for the sixteen months prior to the commencement of custody proceedings. During this period, the plaintiffs have been responsible for the child's care, protection, training and personal relationships. Over the last nine months, the child has lived in New Hampshire where he has attended school,

developed interpersonal relationships with friends and family, and been integrated into a community.

■■ While the time it takes to break old attachments and form new ones depends on the different meaning that time has for a child at each stage of his development and cannot be measured objectively by a calendar, GOLDSTEIN, FREUD & SOLNIT, BEYOND THE BEST INTERESTS OF THE CHILD at 40–41, the Act nevertheless establishes a presumption that after six months residency in a state, a child has sufficient ties to the community to make available substantial evidence in that state concerning his welfare. *See Commissioners' Note*, 9 U.L.A. at 123; Bodenheimer, 22 VAND. L. REV. at 1221–25. We recognize that this presumption may be rebuttable under RSA 458-A:3 I(b) (Supp. 1979) and RSA 458-A:7 III (Supp. 1979). *See* Bodenheimer, *supra* at 1226–27; *see, e.g., Hofer v. Agner*, 373 So. 2d 48, 51 (Fla. Dist. Ct. App. 1979); *Etter v. Etter*, 43 Md. App. 395, 398–402, 405 A.2d 760, 763–64 (1979). *But see* Ratner, *Procedural Due Process and Jurisdiction to Adjudicate*, 75 Nw. U. L. REV. 363, 417–18 (1980). The defendant's mere assertion that she intends to have only witnesses residing in England testify on her behalf in any custody proceeding, however, is insufficient to rebut the presumption. *See Neal v. Superior Court*, 148 Cal. Rptr. 841, 843 (Cal. App. 1978).

Nor is the fact that Mr. Brauch may have been returned to and incarcerated in England sufficient to rebut the presumption that New Hampshire is the proper forum. The decision whether to assume jurisdiction is not based on the convenience of the feuding parties, but rather on the child's interests. *Commissioners' Note*, 9 U.L.A. at 124. On the other hand, public policy discourages, and should not make convenient, childnapping.

■ Because the child has resided in New Hampshire for the nine months preceding the initiation of custody proceedings and has continued to so reside, we conclude that the court could reasonably find that the greatest amount of information concerning the child's present and future welfare is most readily available in this State. *See In re Marriage of Settle*, 276 Or. at 767, 556 P.2d at 966; *Ellis v. Nickerson*, 24 Wash. App. 901, 906–07, 604 P.2d 518, 521 (1979). Jurisdiction is not mandated here, however, because it may be that evidence in England makes that jurisdiction more convenient as a forum.

Because we are unaware of the facts surrounding the parties since the fall of 1980 and their bearing on the best interests of the child, we remand this case to the superior court in order for it to determine whether New Hampshire now should exercise jurisdic-

tion in this proceeding. If, after exercising its discretion, the court concludes that jurisdiction should now be exercised in this State, it should then proceed to conduct a hearing to determine permanent custody of the child. It must be kept in mind that the defendant has not been heard due to the limited jurisdictional challenge at issue here.

*Affirmed and remanded for further proceedings.*

BROCK and KING, JJ., concur only in the result reached; the others concurred.